IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SUPERL SEQUOIA LIMITED,

OPINION AND ORDER

                Plaintiff,

07-cv-640-bbc

      v.

THE C.W. CARLSON COMPANY, INC.
a/k/a THE CARLSON COMPANY, INC.,

              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

This is a civil lawsuit in which plaintiff Superl Sequoia Limited is suing defendant The C.W. Carlson Company, Inc. a/k/a The Carlson Company, Inc., for breach of contract. Defendant has filed counterclaims alleging breach of contract and breaches of implied warranties.  Jurisdiction is present.  28 U.S.C. § 1332.

Currently before the court is defendant's motion for partial summary judgment of liability on its counterclaims for breach of contract and breach of implied warranties.  I conclude that the parties' agreement is governed by Wisconsin's codification of the Uniform Commercial Code, that plaintiff's inclusion of a mark-up in its manufacturing costs was a breach of the parties' agreement and that plaintiff's delivery of defective and damaged

1

fixtures beached its implied warranty of merchantability.  (Defendant argues breach of express warranty but it never pleaded that theory.)  I conclude further that a material factual dispute remains that precludes granting summary judgment on defendant's counterclaim that plaintiff breached their agreement by failing to timely ship fixtures.  The parties dispute the terms of the shipping schedule to which they agreed.  Accordingly, defendant's motion will be granted in part and denied in part.

From both parties' proposed findings of fact, I find that the following facts are material and undisputed.

## UNDISPUTED FACTS

### A.  <u>Parties</u>

Plaintiff Superl Sequoia Limited is an architectural woodworking firm based in Hong Kong that owns and operates nine factories, employing approximately 10,000 persons. Defendant The C.W. Carlson Company, Inc. is a corporation based in Madison, Wisconsin that manufactures and sells retail store displays and fixtures.  Defendant has one plant, gross annual sales of approximately $15 million and 90 employees.

### B.  <u>Bidding The Martha Stewart Project</u>

On February 28, 2007, Federated Department Stores held a reverse auction allowing

2

companies to bid on supplying custom built fixtures for "The Martha Stewart Project."  The project required supplying more than 4000 custom built fixtures, including headboards, armoires and tables, to be used in store displays in 226 Federated stores around the United States.

Sometime in late January 2007, defendant, through its employee Joe Prey, began discussions with Gary Dembart, an owner of Sequoia Group Holding, Inc. and agent for plaintiff, about a potential agreement to work together on Federated's Martha Stewart Project.  Defendant told plaintiff it would not be able to submit a winning bid on the Martha Stewart Project if its bid was based on its own production prices and it hoped to work with plaintiff to provide the fixtures at a lower cost.  The parties discussed whether and how they would fulfill the project together, that plaintiff would do most of the manufacturing and would ship the fixtures to defendant and that defendant would then send the fixtures to Federated because defendant, not plaintiff, would enter into an agreement with Federated. The parties discussed splitting the profits as well as sharing the burden of the manufacturing cost.

On February 12, 2007, defendant sent an email to plaintiff asking whether plaintiff would be able to provide pricing for the project by February 22.  Plaintiff replied, "Yes. Definitely."  Attached to defendant's February 12 email was an email from Federated, explaining the bidding process and providing Federated's initial expectation "to begin

3

shipping this program on/about May 21st.  All shipments must be complete (in-store) no later than Monday, July 16th."  On February 15, 2007, plaintiff emailed defendant, raising some concerns about the tight schedule, specifically concerns about the short time between obtaining fabric for headboards and expected shipment dates.

On February 16, 2007, plaintiff emailed defendant, attaching a pricing "bid estimate" for the Martha Stewart Project, setting out the cost for manufacturing and shipping different quantities of 11 fixtures.  One column of the bid was labeled "Landed Duty PD Madison, WI Cost EA" and included figures representing the cost, including freight, duty and expediting, to ship the fixtures to Madison, Wisconsin.  Although not labeled as such, the manufacturing cost that plaintiff provided included a mark-up as a contingency to cover anticipated additional costs.  Defendant modified plaintiff's bid estimate to include defendant's cost for handling and distribution of the fixtures as part of the cost to manufacture fixtures.

On February 19, 2007, defendant emailed plaintiff, asking, "When do you expect to have fixture's here in Madison and how many?"  (All email correspondence between the parties is reproduced as written.)  That same day plaintiff replied, "cannot answer that yet, especially without knowing any schedule."  On February 22, 2007, plaintiff emailed defendant, stating

Attached is updated pricing including the Veneer finish Armoire

4

concerns:

> timing and availability of custom corian in china
> timing of delivery and availability of custom fabric
> general availability in china of *quater sawn* ash veneer.

(Emphasis in original).  Like plaintiff's initial pricing bid estimate, the updated pricing included a column labeled "Landed Duty PD Madison, WI Cost EA."  Plaintiff's updated pricing bid estimate was relatively unchanged from its initial pricing bid estimate.  That same day, plaintiff sent another email to defendant, stating in part that

> We can commit to all . . . <u>dependent upon timing</u>.
> Everything rests on 2 things
> > The final schedule
> > The availability of material in china
>
> . . . .
>
> The one other thing that could become an issue is terms. . . . Again, our agreement with you may require that we receive 100% of all funds payed until such time that our costs are covered before there is a split of profit, since we will outlay 100% of the cost.

(Emphasis in original).

Defendant emailed plaintiff that same day, stating in part, "Our feelings are that we need to bring all [fixtures] in from China. . . .  Are thoughts are that some [fixtures] will be needed in May but the bulk being in June and July."  In yet another February 22 email, plaintiff stated, "We are totally on board with the 22% low," which referred to the 22% mark-up that defendant would use in bidding the Martha Stewart Project.

5

Although the parties discussed details, the parties did not enter into a written agreement before defendant participated in Federated's reverse auction on February 28, 2007.  The bid defendant made in the reverse auction was based upon the revised pricing estimate bid plaintiff had provided on February 22 plus the 22% mark-up the parties had agreed upon.  On March 1, 2007, Federated accepted defendant's bid and placed a purchase order totaling $4,968,637.  Federated made various changes to the Martha Stewart Project after accepting defendant's bid, requiring defendant to ask plaintiff for revised pricing, which it provided.  Plaintiff gave defendant a quote of $3,384,059 for manufacturing and shipping the fixtures.

### C.  Shipping Schedule

Sometime in late March 2007, defendant requested a shipping schedule from plaintiff to confirm that all fixtures would be shipped in time to meet Federated's deadlines.  Plaintiff believed that it could not provide a firm shipping schedule because it needed more information, such as the number of fixtures needed by which dates, final fixture designs and availability of materials.  On April 10, 2007, defendant's employee Peter Hennigan emailed plaintiff's agent Dembart, discussing the production schedule necessary to fulfill the Martha Stewart Project:

1.  Bid date Wednesday 28th February 2007.

6

. . . .

5.  China aware that prototypes to be available at Carlson Company by not later than Monday 23rd April 2007. . . . It was always anticipated that prototypes would have to be air freight. . . .

. . . .

7.  We have a commitment to install approximately 6 sites by the end of May 2007. . . .

. . . .

9.  It may be that first consignment has to be air freighted.  This would give you a clear 2 ½ weeks of production allowing for goods to reach Madison Wednesday 16th May 2007.

10.  We would anticipate the bulk of ship dates to be July 2007.

. . . .

12.  It is my understanding that you have all the information you need at this point. . . .

. . . .

16.  Production schedule still awaited from Superl/Sequoia.  This has been the subject of repeated requests and is 2 weeks overdue.

. . . .

Please review your resources in China and confirm to [defendant] as soon as possible that the above referred to schedule will be maintained.  We will help wherever we can

. . . .

Dembart responded on April 11, 2007 in an email, stating in part

> Noted on dates and timing.
>> We plan to have protos flown for you to have the 23rd of April
>> We will air the first 6 stores to meet May 25th timing
>> I am expecting the complete schedule today

On April 12, 2007, Dembart received an email from defendant's employee, Nicole Jahnke, with an updated revised production schedule, stating in part, "The first shipment of 6 [stores] will be air freighted and at the same time, a shipment of 22 will be shipped via container." The schedule did not indicate the quantities of fixtures required for each store. That same day, Dembart emailed Jahnke and Hennigan, stating, "[I] presume this is the type of schedule you want." Attached to the email was a production and delivery schedule. Under the heading "Delivery" in the column labeled week 4 of May, plaintiff listed a total of 345 fixtures.

On April 13, 2007, plaintiff's agent Dembart emailed Jahnke and Hennigan, stating, "Attached is a copy of the request I sent to China yesterday. I am waiting to hear back." The attached "request" contained two proposed schedules for production and delivery of the Martha Stewart Project that Dembart had sent to people involved with the manufacturing in China. Both schedules list a total of 345 fixtures under "Delivery" for the fourth week of May. In a separate April 13 email to Hennigan, Dembart responded to more scheduling concerns. (In the email Dembart responded by typing his responses in all capital letters under Hennigan's numbered paragraphs of concerns.) The email stated in part:

8

1. [Defendant] would confirm that original China schedule not acceptable in that it does not fulfill client needs.  The whole program has to be complete by not later than 30th July 2007.

UNDERSTOOD.  WE ARE ADJUSTING

2. [Defendant's] amended schedule forwarded indicating minimum requirements within latest arrive here in Madison.  We are mindful of the demands this places on manufacture but the dates indicated are strict hold to dates, no slippage.

AGAIN, WE UNDERSTAND WHAT NEEDS TO BE DONE

. . . .

4. [Defendant] must have 6 sites available to install before the end of May 2007 as indicated within our re-submitted schedule.

AGAIN, UNDERSTOOD AND THESE WILL LIKELY BE FLOWN

On April 19, 2007, Jahnke emailed Dembart the formal purchase orders for the Martha Stewart Project, saying, "We will need a confirmation for each order as soon as possible."  Purchase order number 01563271015 requested 208 fixtures by May 25, 2007.  That same day, Hennigan emailed Dembart about receiving confirmation on the arrival of the prototype fixtures "not later than 23rd April 2007," and noting that "[defendant] will then arrange for Federated to view 24th April."  On April 20, 2007, Dembart emailed Hennigan, stating in part

> I have had awful trouble with my email in china.  I have not been able to respond to any messages.  In any event, I would suggest waiting until the 25th for your review with federated.  The protos will air and arrive in Chicago on Saturday.  They should therefore be to you on Monday.  You might want to give us all one day leeway to deal

9

with anything beyond our control.

I will send the schedule later. We have adjusted it to meet all our deadlines. . . .

Dembart did not mention defendant's purchase orders in his April 20 email.

On April 23, 2007, Jahnke emailed Dembart, stating, "We need confirmation for these PO's." Attached to the email was her April 19 email, which included defendant's purchase orders. On April 28, 2007, Dembart emailed Jahnke, stating, "We have your POs. [A]s you noted the shipping schedule is slightly different. Philo Yeung will provide confirmation. We still need to re-coordinate exact items and dates and terms." On April 30, 2007, Dembart sent an email to Hennigan, Jahnke and defendant's owner, Chris Carlson, in which Dembart explained a discrepancy and problem between the two companies' shipment schedules. The email stated in part

Based upon our discussion this afternoon, I layed our two schedules side by side.

. . . .

The very bad news is that the schedule calls for 155 units in MAY, not the 60 (6 stores) we anticipated. [J]ust these 60 fixtures cost $72,000 to air. [I] thought if [defendant] produced these 60, we could also try to compress some of our schedule forward to catch up earlier. [H]owever, if this is a must have, we are going to need [defendant] to make 60 just to be close to the 155 these 6 stores need.

Attached to the email was a comparison of plaintiff's and defendant's shipment plans. The comparison sheet shows that plaintiff planned to ship 345 fixtures in the second to last week of May. Plaintiff projected that those fixtures would not arrive until June 15 because

10

plaintiff planned to ship them by sea and it takes approximately 3 weeks for items shipped by sea from China to reach their destination in the United States.  To solve the shipping deadline problem, the parties agreed that defendant would produce 102 of the fixtures to satisfy Federated's deadline for the first six stores, and the parties would split the cost.

### D.  Shipping Delays and Defective and Damaged Fixtures

Delays and missed deadlines arose in shipping fixtures from plaintiff to defendant and then having defendant distribute fixtures to Federated stores.  At one point 37 Federated stores were in jeopardy of not receiving fixtures by the set deadline.  On June 4, 2007, plaintiff's agent, Marc Roberts, emailed Federated, apologizing for the delivery delays and explaining that any problems causing delays were being corrected.

Throughout the Martha Stewart Project, defendant received defective and damaged fixtures from plaintiff.  Plaintiff offered to repair or replace such fixtures.  Defendant remedied many of the defective and damaged fixtures itself.

### E.  The Agreement

On May 7, 2007, Dembart, acting as plaintiff's agent, and Carlson, defendant's owner, traded emails regarding the parties' agreement surrounding the Martha Stewart Project.  Carlson sent an email listing numbered paragraphs to be agreed upon.  Dembart

11

initially responded by typing "**AGREE**" or adding some information after each paragraph and emailing his response back to Carlson.  Later the same day, Dembart emailed Carlson and titled the document "CARLSON COMPANY AND SUPERL SEQUOIA GUIDING AGREEMENT."  Dembart's email contained some additions to Carlson's initial agreement email.  On May 8, 2007, Dembart sent Carlson a slightly modified version of his May 7 email (removing a paragraph repeated in two parts of the May 7 email), with the phrase "any more comments?" in the subject line of the email.  Carlson did not respond to either of Dembart's May 7 emails or the one he sent on May 8.

Dembart's second May 7 email states in part

1.  The over riding theory and agreement is CC ([defendant]) and SS ([plaintiff]) share quoted costs (not sell price, but costs) of manufacturing 50/50 so that if there is any financial risk of non-payment, both CC and SS share that risk equally.  By "sharing," we define CC pays 1/2 of SS's manufacturing costs if SS is the primary manufacturer, and vice versa if [CC] is the primary manufacturer.

2.  There are many different scenarios that can be addressed, but neither CC or SS believes in an overly complicated agreement.  The overriding principle is that both CC and SS share equally in JOINT manufacturing costs to date so we always have, within reason, the same financial exposure for costs to date.  This excludes any overhead either party might have or indirect costs.

3.   Using the Martha Stewart project as a guide, where SS is the primary manufacturer, SS and [CC] will agree on a manufacturing cost, order quantity and shipping/production schedule at the beginning of the project.  SS will request start up deposit and subsequently invoice [CC] for 50% of the manufacturing cost at the time of each shipment, to be paid within 3 days by [wire].

. . . .

12

4.  CC and SS will mutually trust one another with the factual accuracy of "draws" and/or expenses to date, but either party may request satisfactory documentation from the other if requested, and do so in a timely fashion, and neither CC or SS will imply or infer any offense or mistrust from the other by that request. Wherever/whenever possible, CC [and] SS will have pre-agreed manufacturing cost that will dictate payment amount(s).

. . . .

7.  In an instance where the customer's payments have lagged or do lag behind substantial production expenses, and CC has put forward to SS monies (because SS is the primary manufacturer) x dollars to date, (or vice versa) it remains, that all payments received from customer will be shared 50/50 so that both CC and SS are repaid their investment at an equal rate.

8.  If manufacturing and/or any other hard expenses have been shared equally to date, and the whole (and/or last) of the order is on the water, any further customer's payments forthcoming will be "waited on" by both parties, and shared equally when receive, [wired] within three working days.

. . . .

11.  Production errors, engineering errors, omissions, etc. are to be the sole expense (not shared) of the party that incurred the error. . . .

On May 16, 2007, Dembart emailed Carlson about their agreement, stating, "We split costs of manufacturing 50/50 and the profit 50/50. [W]e share the investment risk 50/50, etc."  On June 18, 2007, in an email regarding a dispute over payment between plaintiff and defendant, Carlson cited the guiding agreement between the parties. Specifically, Carlson stated, "THE agreement we have, last agreed to and written by Gary on May 07, enclosed herein for your your reference."  The "agreement" attached to Carlson's

13

June 18 email was Dembart's May 7 email containing the document titled Carlson Company and Superl Sequoia Guiding Agreement.

### F.  Documentation of Costs

At some point after June 2007, defendant demanded documentation of plaintiff's costs regarding the manufacturing and shipping of the Martha Stewart Project fixtures. Plaintiff refused to provide such documentation unless defendant agreed to pay half its actual manufacturing costs.

### OPINION

### A.  Governing Contract Law

The parties assume that Wisconsin law governs this dispute.  I will follow the parties' lead and make the same assumption.  FutureSource LLC v. Reuters Ltd., 312 F.3d 281, 283 (7th Cir. 2002) (in absence of any discussion of choice of law issues by parties, court applies law of forum state).

Contract interpretation is a question of law.  Deminsky v. Arlington Plastics Machinery, 2003 WI 15, ¶15, 159 Wis. 2d 587, 600, 657 N.W.2d 411, 418.  The cardinal purpose of interpreting a contract is to ascertain the intent of the parties.  Huml v. Vlazny, 2006 WI 87, ¶52, 293 Wis. 2d 169, 196, 716 N.W.2d 807, 820 (citation omitted).

14

"[C]ontract terms should be given their plain or ordinary meaning." Id.  When the contract

is unambiguous, "determin[ing] the parties' intent ends with the four corners of the contract,

without consideration of extrinsic evidence." Id. ¶52, 293 Wis. 2d at 197, 716 N.W.2d at

820 (citing Goldstein v. Lindner, 2002 WI App 122, ¶ 12, 254 Wis. 2d 673, 648 N.W.2d

892).

The Wisconsin courts have explained a court's role in contract interpretation as

follows:

> the office of judicial construction is not to make contracts or to reform them, but to
> determine what the parties contracted to do; not necessarily what they intended to
> agree to, but what, in a legal sense, they did agree to, as evidenced by the language
> they saw fit to use.

Miller v. Miller, 67 Wis. 2d 435, 441-42, 227 N.W.2d 626, 629 (1975) (internal quotation

marks omitted) (quoting Marion v. Orson's Camera Centers, Inc., 29 Wis. 2d 339, 345, 138

N.W.2d 733, 736 (1966) (quoting Wisconsin Marine & Fire Insurance Co. Bank v. Wilkin,

95 Wis. 111, 115, 69 N.W. 354  (1897)).  However, "[w]here ambiguity is found, extrinsic

circumstances may be resorted to in order to ferret out the intent of the parties." Moran v.

Shern, 60 Wis. 2d 39, 48, 208 N.W.2d 348, 352 (1973) (citation omitted).


B.  Governing Agreement

As an initial matter the parties disagree about which email document is the binding

agreement between the parties.  Defendant contends that it is Dembart's May 7 email in which Dembart responded to the majority of Carlson's numbered paragraphs with "**AGREE**."  Plaintiff contends that it is Dembart's May 8 email to Carlson titled Carlson Company and Superl Sequoia Guiding Agreement.  Although the email documents to which the parties refer have more or less the same terms, I believe both parties are incorrect about which email constitutes the parties' agreement.

Under Wisconsin law, an "agreement" is "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance . . . ."  Wis. Stat. § 401.201(3).  The email document to which both parties agreed in the course of dealing was Dembart's second May 7 email document titled Carlson Company and Superl Sequoia Guiding Agreement.  This email document uses many of the same terms Carlson had presented and to which Dembart had agreed and organizes those terms in a more formal format, while making several modifications and additions.

Although Dembart's May 8 email is merely an edited version of the May 7 email, the undisputed facts establish that defendant did not refer to or accept the May 8 email as the guiding agreement.  Moreover, even though Carlson did not respond initially to the Carlson Company and Superl Sequoia Guiding Agreement email (Dembart's second May 7 email), the course of dealing between the parties shows that Carlson accepted the document as the

16

guiding agreement:  he referred to it as "THE agreement we have" and attached the document to an email to remind plaintiff of their agreement.  I conclude, therefore, that Dembart's second May 7 email document titled Carlson Company and Superl Sequoia Guiding Agreement is the binding agreement entered into between the parties.

### C.  Agreement for the Sale of Goods

The parties dispute whether the agreement entered into between the parties is governed by Wisconsin's codification of the Uniform Commercial Code governing the sale of goods.  Plaintiff takes the position that the agreement was for a joint venture to work together to manufacture goods for sale to a third party, Federated, and therefore Wisconsin's UCC laws do not apply.  Plaintiff is correct in asserting that the parties agreed to a joint venture to sell goods to Federated, but incorrect in arguing that any transaction entered into as part of a joint venture cannot be a sale of goods governed by the UCC.

The majority of the provisions in the parties' agreement address the sharing of payment and risk in executing the Martha Stewart Project, a project that cannot happen without the sale of goods.  The agreement states, "[plaintiff] will request a start up deposit and subsequently invoice [defendant] for 50% of the manufacturing cost at the time of each shipment . . . ."  Although the language is silent about what is being manufactured and shipped, it is clear that defendant was being required to pay plaintiff for something that

17

plaintiff would be manufacturing and shipping.  That something was fixtures, as evidenced in the purchase orders defendant sent to plaintiff and the invoices plaintiff sent to defendant.  The manner in which defendant was to pay for the fixtures does not transform the sale of the fixtures into something else.

Plaintiff cannot sustain its contention that there was no "sale" between the parties, as the term is defined in the UCC.  Under Wis. Stat. § 402.106(6), "A 'sale' consists of the passing of title from the seller to the buyer for a price."  Title passes from the seller to the buyer "at the time and place at which the seller completes [his] performance with reference to the physical delivery of the goods . . . ."  Wis. Stat. § 402.401(2); see also Dean Foods Co. v. Brancel, 187 F.3d 609, 617 (7th Cir. 1999).  When plaintiff delivered the fixtures to defendant, title had to pass from plaintiff to defendant if defendant was to convey title to Federated.  The purchase orders and invoices provided the prices for the fixtures:  defendant was to pay 50% of the cost in accordance with the parties' agreement.  This was a sale of goods between the parties.  Accordingly, their agreement is governed by Wisconsin's codification of the UCC.

## D.  Breach of the Agreement

Before discussing whether certain terms of the agreement were breached, it is helpful to take a larger view of what the parties were attempting to accomplish with their agreement.

18

The relationship between the parties was to be mutually beneficial.  Plaintiff was a large woodworking manufacturer in China that could produce fixtures at a lower cost and in greater quantities than defendant could in the United States.  Plaintiff was to produce fixtures and ship them to defendant and defendant would sell the fixtures to Federated. Upon receipt of the fixtures, defendant would pay half of plaintiff's costs of manufacturing and shipping.  Upon payment from Federated, defendant would keep half and provide plaintiff the other half.  The net effect of the arrangement was an equal split of profits and an equal share of the risk of non-payment by Federated.  The language of the agreement makes clear that the parties intended to share the manufacturing cost of producing fixtures for Federated as well as the profits earned from the sale of the fixtures to Federated.

1.  Mark-up in manufacturing costs

Defendant contends that plaintiff breached their agreement when it included a mark-up in the manufacturing costs it quoted defendant for the Martha Stewart Project because manufacturing costs do not include a mark-up as a general rule and the parties never agreed on a different accounting.  As a result, defendant contends, plaintiff was seeking to obtain more than its half of the profits.  Plaintiff concedes that it included a mark-up in the manufacturing costs it quoted defendant, but it asserts that such a mark-up does not violate the agreement because it was necessary to provide defendant with a firm manufacturing cost

19

to use in bidding the Martha Stewart Project.

The language of the agreement does not define "manufacturing costs," but it does say that manufacturing costs "excludes any overhead either party might have or indirect costs." Another provision in the agreement, which addresses sharing costs between the parties, mentions "manufacturing and/or any other hard expenses."  Relying on these provisions, defendant contends that the parties agreed to split only "hard" manufacturing costs.

Beginning with the plain meaning of the language, I find that no reasonable definition of the word "cost" would encompass a mark-up or profit.  Profit is the difference between the sales price and cost.  Mark-up is added to cost to yield profit.  Black's Law Dictionary 992 (8th ed. 2004) ("An amount added to an item's cost to determine its selling price.  See 'profit margin.'").  Materials and labor used to manufacture the fixtures are direct costs because they can be attributed to the product without allocation.  Utilities and general management are indirect costs because they must be allocated to the products.  Mark-up is not a cost in any sense.

The parties' correspondence confirms that it was not their intent to include any mark-up.  When Carlson sent Dembart the original draft of the agreement, he noted that defendant would pay half the costs when plaintiff was the primary manufacturer and that, to determine the costs, plaintiff should inform defendant of "what their "draw" . . . is for the previous two weeks of materials on hand and labor spent for that same previous two weeks.

20

We will [wire] that amount . . . ."  These terms show that the parties intended manufacturing cost to mean materials and labor spent in manufacturing the fixtures.  This conclusion is supported by the agreement's language excluding overhead and indirect costs from "manufacturing costs" and associating "manufacturing costs" with hard expenses.

In addition to the cost of materials and labor, the parties intended the term "manufacturing cost" to include the cost of shipping the fixtures to Madison.  Although use of the term "manufacturing" in reference to cost creates a presumption that shipping is not included in such costs, the parties' other dealings and performance establish their understanding that splitting "manufacturing costs" included splitting shipping costs.  Early in their relationship, plaintiff included shipping costs as part of the manufacturing costs that would serve as the foundation for bidding the Martha Stewart Project and defendant accepted this treatment of the shipping costs.  When plaintiff wrote up the pricing bid estimates of manufacturing cost, labeled  "Landed Duty PD Madison, WI Cost EA," it included the cost to ship the fixtures to Madison.  Therefore, when the parties agreed to split "manufacturing costs" they intended to split the costs expended for materials, labor and shipping with regards to the Federated fixtures.

Plaintiff's inclusion of a mark-up is not a cost expended in materials, labor or shipping.  Absent from the agreement is any specific language or provision permitting plaintiff to include a mark-up in its manufacturing costs.  Moreover, plaintiff has proposed

21

no facts to show that prior to the agreement it informed defendant that the manufacturing costs it was quoting included a mark-up as a contingency to cover circumstances in which actual manufacturing costs exceeded those it was quoting.  Nevertheless, plaintiff contends that its mark-up does not breach the agreement because a mark-up was necessary to provide defendant with firm costs to use to bid the Martha Stewart Project, and therefore the parties' decision to use pre-agreed manufacturing costs implicitly permitted plaintiff to include a mark-up.

The language of the agreement does state, "Wherever/whenever possible, [defendant and plaintiff] will have pre-agreed manufacturing cost that will dictate payment amount(s)." However, the parties' decision to use pre-agreed costs "[w]herever/whenever possible," does not alter the agreement's overriding principle that "both [defendant] and [plaintiff] share equally in JOINT manufacturing costs . . . ."  The agreement's overriding principle shows the parties' intention was to share actual manufacturing costs, which meant that when the parties ran into problems, as they did with the first shipping deadline, they were to hold to the "overriding principle" and work to make sure they were splitting the burden of costs and the benefit of profits.  The agreement's provision permitting a party with questions about the other party's costs to freely "request satisfactory documentation" lends additional support to their intention to split actual manufacturing costs.  If they were not intending to split actual costs, there would be no need for free access to documents that showed what

22

each other was spending.

It is true, as plaintiff contends, that if actual manufacturing costs exceeded quoted costs, a mark-up would allow plaintiff to avoid losing profits.  However, if plaintiff wanted to protect itself with such a contingency mark-up it should have bargained for it.  If actual manufacturing costs were less than quoted costs, the mark-up would provide plaintiff with more than its fair share of the agreed-upon 50/50 split of the profits because defendant would have paid more than 50% of the costs.  Thus, regardless of the reason plaintiff included the mark-up, doing so was clearly contrary to the agreement because it would violate the agreement's overriding principle.

The parties entered an agreement to split both the risk of non-payment and resulting failure to recover "manufacturing costs" and the profits associated with the Martha Stewart Project.  In agreeing to split manufacturing costs, the parties intended to split actual costs expended in materials, labor and shipping.  Plaintiff's inclusion of a mark-up in its manufacturing costs breached the parties' agreement because it prevented a split of actual costs and placed plaintiff in a position to receive more than half the profits.  Therefore, I will grant defendant's request for summary judgment on its claim that plaintiff is liable for breaching their agreement by including a mark-up in its manufacturing costs.

Although the amount of damages recoverable for the breach remains unresolved, I note that plaintiff's failure to perform according to its obligations under the agreement

23

entitles defendant to recover as damages "the loss resulting in the ordinary course of events from [plaintiff's] breach as determined in any manner which is reasonable." Wis. Stat. § 402.714(1).

2. Timely shipments

Defendant requests summary judgment on its claim that plaintiff breached their agreement when it failed to deliver 155 fixtures by the end of May. The parties dispute whether plaintiff agreed to comply with any shipping schedule necessary to meet Federated deadlines and whether defendant gave plaintiff sufficient notice to allow plaintiff to meet the shipping deadlines defendant set.

The agreement says only that the parties intended to agree on shipping schedules before the project began. It does not identify any agreed-upon shipping schedule. Both parties sent each other multiple shipping and production schedules. If they agreed on any one, it is not evident from the record. It is unclear as well what plaintiff knew of regarding shipping deadlines. Plaintiff knew that six stores required fixtures by the end of May, but it is disputed whether it knew how many fixtures were needed for those six stores. With these material facts still in dispute, defendant's request for summary judgment on this issue must be denied.

24

E.  Warranties

Defendant contends that plaintiff breached either an express warranty to pay for the expenses resulting from defective and damaged fixtures or, if there was no express warranty, the implied warranties of merchantability and fitness for a particular purpose set out in the UCC.  However, defendant filed no counterclaim for breach of an express warranty.  I cannot rule on a claim that defendant failed to assert at the outset of this lawsuit without amending the pleadings, which is not anything that defendant has requested.  The point is of little consequence however, because the remedy for breaching an express warranty is the same as for breaching an implied warranty.  Defendant's remedy in the form of damages for either breach is measured by "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted."  Wis. Stat. § 402.714(2).

Plaintiff does not even address defendant's contention that plaintiff breached the implied warranty of merchantability.  Therefore, because it is not the court's role to piece together appropriate arguments for a party, Little v. Cox's Supermarkets, 71 F.3d 637, 641 (7th Cir. 1995), plaintiff loses on this issue.  Plaintiff admits that some of the fixtures it produced were damaged and defective; it follows that those fixtures were not "fit for the ordinary purposes for which such goods are used."  Wis. Stat. § 402.314(2)(c).  Therefore, plaintiff breached the implied warranty of merchantability.

25

Plaintiff asserts that it offered to fix the damaged and defective fixtures and therefore, cannot be held to have breached any warranty.  However, a buyer may sue for breach of warranty even though it accepted the goods.  Wis. Stat. § 402.714.  Therefore, plaintiff's offer to fix the damaged or defective fixtures does not mean it did not breach an implied warranty of merchantability.

As plaintiff notes correctly, defendant provides no evidence of how many fixtures were damaged or defective.  Therefore, although plaintiff breached its implied warranty of merchantability, what and how many fixtures were damaged or defective remains to be determined.


ORDER

IT IS ORDERED THAT defendant the C.W. Carlson Company, Inc.'s motion for partial summary judgment (dkt. #21) is

1.  GRANTED with respect to defendant's counterclaim that plaintiff Superl Sequoia Limited is liable for breaching the parties' agreement by including a mark-up in its manufacturing costs and with respect to its counterclaim that plaintiff is liable for breaching its implied warranty of merchantability.

26

2.   DENIED with respect to defendant's counterclaim that plaintiff is liable for breaching their agreement by failing to make timely shipments.

Entered this 22nd day of July, 2008.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge

27