IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SUPERL SEQUOIA LIMITED,

OPINION AND ORDER

Plaintiff,

07-cv-640-bbc

v.

THE C.W. CARLSON COMPANY, INC.,
a/k/a THE CARLSON COMPANY, INC.,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In 2007, when Federated Department Stores, Inc. asked for bids on at least 4000 fixtures for a special store project showcasing Martha Stewart bedding and towels, defendant The Carlson Company, Inc. saw a business opportunity. Although defendant is in the business of manufacturing store fixtures, with an operation in Madison, Wisconsin, it believed that its labor costs would be too high to be competitive on the bid. Instead, it sought out plaintiff Superl Sequoia Limited, a company with which it had worked in the past, and which could arrange for production in China. The parties agreed to an equal split of any profits over and above each party's quoted costs for the project. Straightforward as this arrangement appeared, it became a source of contention when the shipments from China

1

were late, the fixtures arrived in damaged or defective condition, the costs of transportation exceeded the parties' expectations and Federated asked defendant to do special work for it, over and above the work that was the subject of the bid.

Plaintiff is seeking the full amount of its quoted costs from defendant, together with the extra expense it incurred in air freighting certain shipments and expediting others. Defendant is unwilling to pay plaintiff any more than it already has, arguing that plaintiff violated the parties' agreement by including in its quotation profit and overhead and that it shipped fixtures late and in an unmerchantable condition.   Defendant wants reimbursement for the work it did to make the products merchantable.  Plaintiff balks at paying for defendant's repair and restoration work on the fixtures, contending that defendant's records are inadequate to support its claims.

Defendant has been paid in full by Federated (now Macy's, Inc.) for the fixtures, but it has withheld payment to plaintiff, disputing plaintiff's entitlement to any more money for its role in the project.  Moreover, it refuses to share any of the money it received from Federated for extra tasks related to the project but not part of the original bid.

Plaintiff brought suit against defendant in November 2007, seeking money damages of at least $2,263,388.50 allegedly owed it under the parties' agreement.  Defendant counterclaimed for breach of contract, alleging that plaintiff's quoted prices included profit as well as direct costs, in violation of their agreement, and that plaintiff breached its implied

warranties of merchantability and fitness for purpose by sending defective and damaged fixtures. It included a counterclaim for misrepresentation against plaintiff. In a third party complaint, defendant alleged that plaintiff, plaintiff's agent Gary Dembart and a partner of plaintiff's known as Sequoia Group Holdings LLC made misrepresentations to defendant about the "costs" it was charging defendant. Defendant sought damages and a return of overpaid amounts.

In an order entered on February 26, 2008, I dismissed defendant's misrepresentation counterclaim and its third-party complaint on the ground that the economic loss doctrine barred defendant's claim for misrepresentation. As a general rule, this doctrine limits commercial parties to their contractual remedies when pursuing claims for economic losses. Defendant did not show why the general rule would not govern in this case. Order, dkt. #14, at 5. In another order, entered on July 23, 2008, I granted defendant's motion for summary judgment of liability on its counterclaims for breach of contract and breach of implied warranties, finding that plaintiff's mark-up of its manufacturing costs was a breach of the parties' agreement and that plaintiff breached its implied warranty of merchantability when it delivered defective and damaged fixtures. This left for trial the determination of the amount of money each party is entitled to receive under the agreement and the damages due defendant for plaintiff's breach of warranty and failure to make timely deliveries.

I conclude that plaintiff is not entitled to treat as shared costs any amount above and

3

beyond the amount it paid the furniture maker, Wanhengtong, plus the amount it estimated for freight, because it has not produced evidence of any other quotations or estimates it made that do not include overhead or profit.  Plaintiff is not entitled to the extra expenses it incurred for air freight or for expedited delivery from the West Coast because these expenses were the result of its own delays in manufacturing and shipping the fixtures. Defendant is entitled to treat as shared costs its estimated costs for handling and distribution of the fixtures and for the quoted costs of mattresses and box springs and is entitled to reimbursement for the expenses it incurred in manufacturing, repairing and restoring fixtures, as well as unanticipated freight costs it was required to pay because of plaintiff's late deliveries and failure to ship miscellaneous items.

From the record and the evidence adduced at trial, I find the following facts.

## FACTS

### A. <u>The Parties</u>

Plaintiff Superl Sequoia Limited is a foreign corporation based in Hong Kong.  It is a sourcing organization that, among other things, manages production of product in China, including retail fixtures and millwork.  Sequoia Group Holdings, Inc. acts as plaintiff's agent in the United States.  Gary Dembart is one of Sequoia Group Holdings' owners, as well as an employee of the company and an agent for plaintiff.  Sequoia Group Holdings, plaintiff

4

and a third entity, Superl Holdings LTD HK, are a partnership,

Defendant The Carlson Company is a Wisconsin corporation based in Madison, Wisconsin.  It is engaged in the business of manufacturing, selling and installing retail store displays and fixtures, commercial casework and architectural millwork.  It has one plant and 90 employees.

## B. Bidding the Martha Stewart Project

### 1. Preliminary discussions between the parties

In early 2007, the parties began discussing an agreement to bid a large project for Federal Department Stores, Inc., known as the Martha Stewart Project.  The project called for the manufacture of a number of custom built fixtures, including headboards, armoires, tables, table tops and other items.  Knowing that it could not submit a viable bid unless most of the manufacturing was done in China, defendant brought in plaintiff, which had the connections in China to arrange for the manufacturing to be done there.  The parties agreed that defendant would be the bidder and that plaintiff would manufacture the fixtures in China and ship them to defendant in Madison for delivery to Federated.

Plaintiff secured a manufacturing bid from a Chinese firm, Wanhengtong, for the fixtures.  (Plaintiff maintains that it never received a bid from Wanhengtong before it quoted defendant a manufacturing cost but instead had its own costing department provide an

5

estimate of the cost of manufacturing, to which it added a 60% mark-up in recognition of the profit that an outside manufacturing company would build into its price. I do not find it credible that plaintiff did not have a bid from Wanhengtong before it calculated its quoted price for the fixture manufacturing. This position is inconsistent with the information plaintiff provided in discovery that, starting in February 2007, Paul Chan, plaintiff's vice president, had a few telephone conversations each day with Wanhengtong regarding Wanhengtong's price for manufacturing and that the content of the conversations was primarily the prices that Wanhengtong would charge plaintiff for the fixtures, as well as the required delivery schedules. Exh. #871 at 22. According to the discovery response, Chan sent the Federated drawings to Wanhengtong Furniture Company and other furniture companies for quotations; Wanhengtong provided the best quote, to which he added additional costs for insurance, transportation, additional materials and plaintiff's required operations, as well as a markup of 20% as a contingency to cover additional costs associated with manufacturing products in China for shipment to the United States. Id. at 21. Plaintiff never advised defendant that it needed to revise the discovery responses or Chan's deposition testimony. Chan's trial testimony is not credible for another reason. It is unlikely that plaintiff would rely on its internal operations for the quote when it does no manufacturing in-house. Moreover, plaintiff's credibility is undermined on this point by the position it takes in its response brief, dkt. #123 at 10, that it did not have a bid from Wanhengtong

until March 27, 2007, when its own exhibit #149 shows that it had a quotation from Wanhengtong in hand no later than March 9, 2007.)

Chan estimated that plaintiff would need 120 containers for the shipments and that the total freight charge per container would be $4300 to $4500 (including ocean freight and rail to Madison), or $516,000.  Tr., dkt. #103, at 46; dkt. #111, at 111-112.

Federated provided drawings of the fixtures to defendant by email on February 9, 2007; in the same email, it told defendant that Federated would expect the winning manufacturer to begin shipping the fixtures on or about May 21 and finish by July 16.  Exh. #501.  Dembart assured defendant repeatedly that it would be able to meet the schedule.

On February 16, 2007, plaintiff emailed defendant, attaching a pricing "bid estimate" for the Martha Stewart Project, setting out the estimated cost for manufacturing and shipping the necessary quantities of each of the 11 fixtures.  Exh. #6.  On February 19, 2007, defendant emailed plaintiff, asking, "When do you expect to have fixture's here in Madison and how many?"  Exh. #7.  (All email correspondence between the parties is reproduced as written.)  That same day Dembart replied, "I can not answer that yet, especially without knowing any schedule."  Id.  On February 22, however, Dembart emailed Chan, saying that plaintiff was estimating that it would ship one-third of the total quantity of fixtures each month, although it would be better if it were 20% in May, 33% in June and 47% in July.  Exh. #510.

7

2. <u>Plaintiff's cost quote</u>

On February 22, 2007, plaintiff emailed updated pricing to defendant.  As with plaintiff's initial price estimate, the updated pricing included a column labeled "Landed Duty PD Madison, WI Cost EA," which reflected plaintiff's quoted cost for each kind of fixture. The quote included the cost of manufacture, to which Chan added a markup of at least 50%. Plaintiff says now that this was for estimated shipping costs based on ocean freight from China to the West Coast of the United States and other costs.   To this amount, Dembart added approximately 18% to cover the estimated cost of freight from the West Coast to Madison and for unanticipated costs, such as producing and shipping prototypes of the fixtures.  He did not tell defendant how plaintiff had calculated the costs it quoted.

3. <u>Defendant's cost quote and bid</u>

Defendant modified plaintiff's bid estimate to include its own costs for handling and distribution of the fixtures.  It based its bid to Federated on the revised estimate that plaintiff had provided on February 22, plus the 22% markup for profit the parties had agreed upon.  Exh. #508.

8

## C. Bid Revisions

On March 1, 2007, Federated accepted defendant's bid and placed a purchase order totaling $4,968,637.  Thereafter, the parties exchanged emails on changes Federated had made to the project, such as to the finish on some items and the elimination of other items. As of March 15, plaintiff had photographs of the prototypes it was to produce for Federated's review and a final decision on the paint finish it was to use.  It knew it had to work on getting a "harder" finish on the painted surfaces but could wrap fabric around the headboards for the beds, rather than sew it.  Defendant learned that the manufacturer of Corian had discontinued the color specified in the bid, but had agreed to make a special run of that color for the project.  The parties agreed that defendant would buy the required mattresses and box springs in the United States.  After revising its pricing to take these changes into account, plaintiff gave defendant a quote of $3,384,059 for manufacturing and shipping the fixtures.

## D. Shipping Schedules

Plaintiff's agent, Gary Dembart, knew immediately after the auction that Federated was planning store by store installations, and that shipping would be done by stores.  Tr., dkt. #102, 67-68, 73.  On March 15, 2007, defendant's employee, Joe Prey, wrote Dembart to ask whether plaintiff could work on a shipping schedule because defendant had to let

9

Federated know how many items defendant would be shipping each week, starting in May and ending in July. Exh. # 518. Dembart forwarded the email to Paul Chan. On the same day, Nicole Jahnke, defendant's project manager, advised Dembart of six changes plaintiff needed to make in its production drawings.

Because the production of the Corian was delayed, the parties agreed that defendant would manufacture and install 50 Corian tops for the early shipments, leaving 177 units for manufacture by plaintiff, which would also manufacture all the table bases. They agreed that plaintiff's credit for the table bases was to be modified accordingly. Exh. #17.

On April 10, 2007, defendant's general manager, Peter Hennigan, called Dembart to discuss the production schedule. Following the call, Hennigan emailed Dembart to go over the matters covered in the call, such as the fact that all approved working drawings had been issued to plaintiff on April 3. Exh. #21. He pointed out that plaintiff was aware that the prototypes were to be available at defendant's plant no later than April 23, so that Federated could inspect them, and that defendant had a commitment to install approximately six sites by the end of May. He said that it might be necessary for plaintiff to air freight the first consignment for the six sites because that would give plaintiff two and one-half weeks of production, "allowing for goods to reach Madison Wednesday 16th May 2007." He reiterated the need for plaintiff to send defendant a production schedule, noting that the schedule had been the subject of repeated requests and was now two weeks overdue. Id. In

10

response, Dembart wrote on April 11 to say that plaintiff planned to have prototypes flown to defendant to arrive before April 23.  He added that plaintiff would air ship the fixtures for the first six stores to meet the May 25th deadline and that he was expecting the complete schedule from Paul Chan that day.  Exh. #23.  He apologized for the delay in the schedule, attributing it to plaintiff's not understanding that the different kinds of fixtures were to be produced simultaneously, but by the job, and thinking that it could produce many multiples of one kind of fixture before beginning production on another kind.  Exh. #549.  Dembart told Chan that plaintiff should not charge defendant for the cost of shipping the prototypes. Exh. #849.

On April 12, 2007, Dembart received an email from project manager Jahnke, with an updated revised production schedule.  Jahnke confirmed that "[t]he first shipment of 6 [stores] will be air freighted and at the same time, a shipment of 22 will be shipped via container."  Jahnke's schedule did not indicate the quantities of fixtures required for each store.  Exh. #26.  That same day, Dembart emailed Jahnke and Hennigan, stating, "I presume this is the type of schedule you want."  Attached to the email was a production and delivery schedule.  Under the heading "Delivery" in the column labeled week 4 of May, plaintiff listed a total of 345 fixtures.  Exh. #28.

On April 13, 2007, plaintiff's agent Dembart emailed Jahnke and Hennigan, stating, "Attached is a copy of the request I sent to China yesterday.  I am waiting to hear back."

11

The attached "request" contained two proposed schedules for production and delivery of the Martha Stewart Project that Dembart had sent to people involved with the manufacturing in China.  Both schedules listed a total of 345 fixtures under "Delivery" for the fourth week of May.  Exh. #30.  In a separate April 13 email to Hennigan, Dembart responded to more scheduling concerns.  Exh. #554.  He agreed that the original China schedule was not acceptable because it would not meet defendant's needs to have the shipping complete by July and he told Hennigan that plaintiff was "adjusting."  Id.  He agreed that defendant's amended schedule included strict delivery dates with no room for slippage and he said that, because defendant had to have the fixtures for six sites ready for installation,  it was likely that plaintiff would send these fixtures by air.  Id,

On April 19, 2007, Jahnke emailed Dembart the formal purchase orders for the Martha Stewart Project, saying, "We will need a confirmation for each order as soon as possible."  Exh. #557.  Purchase order number 01563271015 requested 208 fixtures by May 25, 2007.  That same day, Hennigan emailed Dembart about receiving confirmation of the arrival of the prototype fixtures "not later than 23rd April 2007," noting that "[defendant] will then arrange for Federated to view 24th April."  Exh. #38.  On April 20, 2007, Dembart emailed Hennigan, saying that he had had trouble with his email in China and had been unable to respond to any messages.  He suggested that defendant put off the Federated review of the prototypes until April 25, to give both parties a "one day leeway to deal with

anything beyond our control." Exh. #38.  He added that although he would be sending the schedule, it had been adjusted to meet all deadlines.  Id.  Dembart did not mention defendant's purchase orders in his April 20 email.

On April 23, 2007, Jahnke emailed Dembart, stating, "We need a confirmation for these PO's." Exh. #560.  Attached to the email was her April 19 email, which included defendant's purchase orders.  On April 25, Dembart emailed Jahnke an amended  shipping schedule that showed the arrival of 60 fixtures in Madison on May 18; 100 fixtures on June 1; 345 fixtures on June 8; and 830 fixtures on June 15,  with the remaining fixtures arriving weekly through July 13. Exh. #564.  Under this amended schedule, plaintiff would not be delivering the fixtures for the first six stores by the due date of May 25, 2007.

On April 27, Dembart emailed defendant's owner, Chris Carlson, asking whether the parties would share the cost of air freighting the fixtures for the first six stores, which would cost between $80,000 and $100,000.  Alternatively, he suggested, defendant could try to manufacture the fixtures for shipment by May 25.  He added, "the real cost of this in your shop including profit is probably $100K and you would have to bust ass to do it." Exh. #840.

On April 28, 2007, Dembart emailed Jahnke, stating, "We have your POs.  [A]s you noted the shipping schedule is slightly different.  Philo Yeung will provide confirmation.  We still need to re-coordinate exact items and dates and terms."  On April 30, 2007, Dembart

13

sent plaintiff a revised shipping schedule, showing deliveries one week later than promised in the April 25 schedule.  In the same email, Dembart noted the discrepancy in the parties' shipment schedules.  "The very bad news is that the schedule calls for 155 units in MAY, not the 60 (6 stores) we anticipated.  just these 60 fixtures cost $72,000 to air.  I thought if [defendant] produced these 60, we could also try to compress some of our schedule forward to catch up earlier.  however, if this is a must have, we are going to need [defendant] to make 60 just to be close to the 155 these 6 stores need."  Exh. #577.  The attached shipping schedule added another week to the arrival times for plaintiff's deliveries.

On May 2, in a series of emails exchanged during the day, following an early morning telephone call, the parties agreed that defendant would produce 102 of the 144 fixtures needed for the first six stores and that plaintiff would produce another 42 items (18 bedframes and 24 toppers ).  Plaintiff would send all the necessary hardware for the fixtures by air; defendant would buy the casters locally.  Plaintiff suggested that defendant take as a credit the cost it incurred in making the fixtures, minus the cost of the materials that plaintiff was providing.  Exh. #595.  Later, it confirmed that defendant's costs of manufacturing would include all overtime costs.  Exh. #605.

E. The Parties' Agreement

Although the parties discussed details of the project, they did not enter into a written

14

agreement before defendant participated in Federated's reverse auction. The parties' working agreement is incorporated in an email dated May 7 from Dembart to Peter Hennigan and other employees of defendant. Exh. #85. The parties agreed that

1. The over riding theory and agreement is CC (Carlson Company) and SS (Superl Sequoia) share quoted costs (not sell price, but costs) of manufacturing 50/50 so that if there is any financial risk of non-payment, both CC and SS share that risk equally. By "sharing," we define CC pays ½ of SS's manufacturing costs if SS is the primary manufacturer, and vice versa if [CC] is the primary manufacturer.

2. There are many different scenarios that can be addressed, but neither CC or SS believe in an overly complicated agreement. The overriding principle is that both CC and SS share equally in JOINT manufacturing costs to date so we always have, within reason, the same financial exposure for costs to date. This excludes any overhead either party might have or indirect costs.

3. Using the Martha Stewart project as a guide, where SS is the primary manufacturer, SS and [CC] will agree on a manufacturing cost, order quantity and shipping/production schedule at the beginning of the project. SS will request a start up deposit and subsequently invoice [CC] for 50% of the manufacturing cost at the time of each shipment, to be paid within 3 days by [wire].

* * * * *

(b) During the process of estimating the cost and shipping schedule, consideration will be given to the need of accelerated deliveries, specifically, air freight. If there is a mutual understanding during this process that air shipment will be required to meet schedules, either the additional cost will be factored into the estimate, or, there will remain an understanding the additional cost of air freight will be shared 50/50.

4. CC and SS will mutually trust one another with the factual accuracy of "draws" and or expenses to date, but either party may request satisfactory documentation from the other if requested, and do so in a timely fashion, and neither CC or SS will imply or infer any offense or mistrust from the other by that request.

15

Wherever/whenever possible, CC & SS will have pre-agreed manufacturing cost that will dictate payment amount(s).

* * * * *

11.  Production errors, engineering errors, omissions, etc. are to be the sole expense (not shared) of the party that incurred the error. . . .

## F. <u>Delivery of Fixtures</u>

The parties assumed that plaintiff would have to send the prototype fixtures by air if they were to be delivered to defendant in time for Federated to review them on April 23. Plaintiff sent the prototypes by air, but they did not arrive until April 25.  When defendant uncrated them, it discovered both that they had been damaged in transit because they were not crated properly and that they did not meet the specifications.  The millwork was inferior, as were the painted finishes and the finish of metal legs.  Defendant had to repair the shipping damage, bring the fixtures up to specifications and repaint all the painted parts in order to show them to Federated on May 3.

In addition to its failure to make delivery of the fixtures for the first six stores, plaintiff was unable to make timely delivery of the fixtures specified for delivery by June 1. It had to delay delivery until June 8, and even then was able to meet the deadline only by expediting delivery from the West Coast by "team truck," spending about $3500 more for each container than it would have spent for delivery by rail.  Plaintiff ran into similar

16

problems with the deliveries promised for June 8 and June 15 and again sent the fixtures by team truck from the west coast.  Plaintiff failed to include 18 headboards in the first two June deliveries.  When notified of the omission, plaintiff sent the missing headboards by air freight.

Even with expedited shipping, plaintiff was unable to meet any delivery date promised under its April 25 schedule.  Around July 13, 2007, plaintiff expedited one shipment of Corian at an additional freight cost of $700.

Plaintiff sent two additional shipping schedules to defendant, one on April 30 that and extended the delivery dates and a later one.  Plaintiff has admitted that the April 25 schedule is binding, making the two later schedules irrelevant.  Even if the April 30 schedule governed, however, plaintiff failed to meet the due dates promised under that schedule.

At no time before this lawsuit did plaintiff ever say that it could not afford the technology necessary to produce fixtures that met Federated's standards.  It never attributed to defendant any fault for plaintiff's late deliveries and it never provided any reason for the late deliveries.

In many instances, plaintiff did not include fixtures in compliance with the schedule.  Often, it omitted parts of fixtures, such as bars, shelves, shelf pins, knobs, etc.  When fixtures and parts were missing, defendant had to ship back ordered items to Federated at its own expense, unless it was able to include the back ordered items in a shipment of fixtures to

17

Federated.

## G. Chris Carlson's Visit to Factory in China

On May 20, recognizing that Wanhengtong was having difficulty producing fixtures that met Federated's standards, plaintiff asked defendant's president, Chris Carlson, to visit the factory and suggest changes that would improve the final products. Carlson agreed to do so. He observed that the factory had inadequate lighting, no quality control measures, no electric sanders, low quality glue, improperly dried lumber, below standard paint and no computerized equipment, such as saws, to insure accurate cuts. The "project manager" had no manufacturing experience. Carlson tried to implement quality control measures, but his efforts led to no improvements in the shipments.

## H. Documentation of Costs

At some time in June 2007, defendant demanded documentation of plaintiff's costs regarding the manufacturing and shipping of the Martha Stewart Project fixtures. Plaintiff refused to provide such documentation unless defendant agreed to pay half plaintiff's actual manufacturing costs. At that time, defendant had made a start-up deposit to plaintiff of $250,000, but it had not paid plaintiff's invoices for 50% of the manufacturing cost at the time of each shipment, as provided in the agreement.

18

I. Defendant's Efforts to Cure Defects

With the fixtures arriving in defective condition and time running out, defendant had no choice but to repair and repaint the fixtures as they arrived in Madison. This required opening each and every container, finding storage space for holding the fixtures until they could be re-worked, finding space for the repair work, doing the necessary repairs and repainting, re-packing the fixtures and getting them shipped to Federated.

Defendant had not planned to do this work. It had to clear its schedule, rent space, set up additional paint booths, put its employees on overtime schedules and purchase materials such as paint, lumber and hardware. The long days and weekend work took a toll on both the hourly and administrative employees. It did not help that the work fell during the summer months, when employees would ordinarily be taking vacations and enjoying their weekends.

Defendant charged its work at regular "sell" rates or what it would have been charged by a third party to do the repair work. Its costs were reduced slightly from those a third party would have charged because it did not need to charge for re-shipping to another facility for the repair work.

J. Defendant's Expenses Resulting from Delayed Deliveries and Defective Fixtures

1. Freight charges

19

Defendant incurred freight charges of $63,690.73 when it had to find shippers for fixtures and back ordered items that were not available for shipment by Federated trucks. When it is manufacturing furniture and fixtures for a third party, defendant adds a profit markup to freight charges. Had it been charging a third party in this case, defendant would have charged $98,091 for the freight charges it incurred. (This charge represents 17.91% profit, 64.93% cost and 17.16% overhead.)

2. Materials

Defendant spent $170,035.57 on materials necessitated by plaintiff's breach, including the cost of renting a warehouse to store fixtures waiting for repair or shipment following repair. It would have charged a third party this amount plus a markup for profit of 25.05%, for a total of $230,651. (Plaintiff argues that the cost of renting the extra warehouse should not be attributed to the defective fixtures because defendant was planning to rent the warehouse in any event, it is wrong. Defendant did not decide to rent additional warehouse space until late May, after it began to realize the logistics involved in holding fixtures for repair and re-painting and dealing with delayed shipments. It challenges dumpster charges, but the dumpsters became necessary when defendant saw the trash generated by having to unwrap every fixture for review and repair. It objects to costs for things like pallet jacks, paint booths and utility knives that defendant had to buy to outfit

20

the second warehouse and respond to the level of work required by the defective fixtures. Plaintiff's other objections go to charges too small to merit discussion, such as touch-up kits, a few weekend meals for employees working overtime and extra shelf clips.)

3. Installation

Defendant incurred charges of $11,030 for hiring installers to install delayed or reworked fixtures.  For a third party, defendant would have added a markup for profit of 26.14%, for a total charge of $15,416.

4. Hourly labor

Defendant's hourly employees spent 11,932 hours working on the project (not including splitting the armoires, which was not part of the original project).  Defendant estimates that its employees would have spent 1584 hours on the project but for the breach. The raw wages associated with the remaining hours (8706) is $130,731.  Had defendant been working for a third party, it would have charged $478,830 for the standard hours and an additional $105,088 for the overtime hours.

In addition, defendant paid overtime wages to its employees for hours worked on other projects because most of its workers were tied up with the extra work for the Martha Stewart Project.  The overtime premium amounted to $21,072.  Also, defendant paid its

21

employees $9427 in incentive pay as encouragement to work summer holidays.   Had defendant been charging these amounts to third parties, it would have added a markup of 17% or $5158.

5. Uncoded costs

Defendant incurred costs for Chris Carlson's trip to China and for Federated back charges, together totaling $57,842.

6. Administrative wages

Defendant's administrative employees worked many extra hours and whole days in order to complete the project and repair the defective fixtures.  Their wages for the time they would not have worked but for the need to repair the fixtures total $114,055.  Defendant's benefit load of 21.35% is $24,351.

## K. Defendant's Payments from Federated

During the course of the Martha Stewart Project, Federated issued several change orders to defendant.  The first of these included requests for defendant to crate the Corian tops and to warehouse and handle certain items purchased by Federated from another vendor, including cube sets and bed signs.  (Federated referred to this handling fee as a

22

"visual handling fee.")  Defendant agreed to crate the tops and charged Federated a fee reflecting the crating charge that amounted to $10,927.  Federated paid defendant $11,150 for the visual handling.  It also paid defendant $6055 for extra freight costs.

In a second change order, Federated asked defendant to split certain armoires into two pieces (an upper and a lower unit).  Like the crating and storage of the visual items, this change order was not part of the original bid.  Federated paid defendant $69,962 for this work; defendant incurred $33,823.21 in costs and expenses related to the armoire splitting.

After the conclusion of the project, Federated paid defendant $6006.80 for warehouse storage of items that had not yet been shipped to any store.

Federated has paid defendant a total of $4,992,494.32 on a revised purchase order, which includes the original bid as well as the specific items listed above.  The total includes a $22,100 back charge from Federated resulting from the late delivery of fixtures.  Deducting the money coming from the post-bid work and the credit to Federated, the total amount that defendant has received from Federated attributable to the bid is $4,877,220.

## L. Defendant's Payments to Plaintiff

The parties' agreement provided that defendant was to make a start-up payment to plaintiff and pay plaintiff 50% of the manufacturing cost of each shipment, to be paid by wire within 3 days of the shipment.  Defendant made the first payment for the start-up

($250,000) on April 18, 2007.  It made no further payment to plaintiff until June 25, 2007, although plaintiff had begun making shipments on May 13, 2007, had shipped the majority of the fixtures by June 25, 2007 and had provided defendant timely invoices.  In a meeting with defendant on June 20, 2007, Dembart threatened not to make any more shipments until plaintiff had been paid.  Thereafter, defendant made a payment of $700,000 and it paid plaintiff's invoices for the next three weeks.  It made only one subsequent payment of slightly more than $200,000, which brought the total up to $1,972,065.50.  Plaintiff's invoices to defendant totaled $3,404,395.62.

OPINION

The parties' dispute falls into two main categories:  (1) what each is due under their agreement and (2) the damages due defendant for plaintiff's breach of its implied warranty of merchantability and its alleged failure to make timely delivery of fixtures.  Calculating the amounts due under the first category requires determination of a number of subsidiary questions, starting with deciding what the parties meant when they agreed to share "quoted costs" and specifically, whether they meant the costs each party quoted to the other in preparing the bid or the actual costs each party incurred in carrying out the agreement.  It is also necessary to decide what extra expenses incurred by the parties are to be shared costs, whether plaintiff is entitled to any share of the money Federated has paid to defendant for

24

extra work not covered by the bid and whether defendant breached the agreement by including profit or overhead in the manufacturing projects it carried out, in repairing damaged or defective fixtures received from plaintiff and in buying mattresses and box springs for the project.

## A. Amounts Due under the Agreement

### 1. "Quoted costs" versus "joint manufacturing costs"

In re-reading the July 22, 2007 summary judgment order, I see that it is not entirely clear in one respect.  In discussing what the parties meant when they referred to "costs" in the agreement, I held that the term did not include any markup or profit.  That holding was specific.  However, there is language in the ensuing discussion that leaves it open whether costs refers to the quotes that the parties were providing or to the actual costs that they incurred as the project played out.  For several reasons, the term should be read as referring to the quoted prices the parties were providing.  First, it makes sense in a commercial undertaking such as this one that the parties would be bound by their quoted prices to one another, knowing that their bid (and any chance for profit) was based on those prices.  They understood that if either party's quotations proved inadequate, that party could not come back to ask for more money.  Each ran the risk of its own estimate.  Second, it is unlikely that businesses would agree to allow each other to claim reimbursement for "actual costs";

25

doing so would not impose any fiscal restraint on the other party.  Third, at trial, defendant maintained that it was entitled to the "cost" of its quote for mattresses, despite having been able to buy mattresses for about half the price of the quote it included in the bid.  I infer from its position on the issue that it agrees with plaintiff that "costs" in the agreement referred to "quoted costs."

To the extent that the July 22 opinion could be read as holding that the parties were entitled to claim as costs their actual costs, as opposed to their "quoted costs," I will make it explicit that it should not be read in this way.  This clarification does not change the holding that the parties did not intend that the quotations would include a markup for profit, for overhead or as a contingency to cover circumstances in which the costs exceeded those they were quoting.  It does not affect my conclusion that plaintiff breached its contract with defendant by including a markup in the price it quoted to defendant for manufacture and shipping of the fixtures.

Plaintiff wants to re-visit that issue.  It alleges that the quotation it gave defendant included nothing more than the quotation it received from Wanhengtong for the cost of production (or its internally-generated cost estimate plus a 50% estimated profit), an estimate of the cost of shipping fixtures from the factory to the West Coast, an estimate of the cost of shipping overland from the West Coast to defendant's facility in Madison, and the inclusion of a contingency fee of less than 10% for additional expenses, such as the cost

26

of producing and shipping the prototypes and unanticipated expenses that might arise during the course of the project.

Plaintiff's argument might be stronger if it were willing to produce documents to back up its assertions of what the quotation included. Having refused to provide the documents, it can hardly expect to persuade the court that the components of its quotation are what it says they are. This is particularly true in light of Dembart's and Chan's testimony at trial that both of them added profit markups to their cost estimates. Chan said he added 50% to the estimated cost of the fixtures for profit and freight. Tr., dkt. #111, at 111. He testified that the "profit" to which he was referring was what he expected the manufacturing facility to charge plaintiff, but if, as I have found, he obtained a bid from Wanhengtong in advance of sending plaintiff's quotation to defendant, Wanhengtong's profit would have been included in the price it quoted to plaintiff. Dembart testified that he added his own markup of 10% to Chan's quotation. Tr., dkt. #103, at 48-49. He conceded that this did not jibe with plaintiff's discovery responses in which it had said that it had added a 20% markup to its manufacturing and freight costs, id. at 51; exh. #871 at 21. None of this evidence and nothing in plaintiff's post-trial briefing persuade me to reconsider the conclusion that plaintiff added markup for profit and overhead to its quoted costs for manufacturing and freight and that, in doing so, breached the parties' agreement.

Plaintiff has proved that it had a manufacturing quote from Wanhengtong for

27

$1,642,662 and that it estimated its shipping costs at $516,000, based on 120 shipping containers, with a total freight charge per container of $4300-$4500 from the factory to Madison, for a total of $2,158,662.  It has not proved that it is entitled to any other pre-agreed costs.  Although it says that it included estimates for insurance, additional materials and plaintiff's "required operations," exh. #871 at 21, it has not identified the estimated additional costs.  It does say that it added "a markup of 20% as a contingency to cover anticipated additional costs associated with manufacturing products for shipment to the USA."  Id.  It adds that the resulting amount was the manufacturing cost to which the parties agreed, but it has not proved that defendant was aware of the breakdown of costs generally or the inclusion of the 20% markup for contingencies specifically.

Plaintiff argues that the court should find that defendant knew of the contingency markup because Marc Roberts, an agent of plaintiff, testified at trial that he had discussed this contingency with plaintiff's employee Joe Prey and that Prey had approved it.  I am not willing to make such a finding.  If Roberts had information to this effect, plaintiff should have made it the subject of a proposed finding of fact during briefing on the motion for summary judgment, rather than produce it at trial, after the motion had been decided.  AA Sales & Associates, Inc. v. Coni-Seal, Inc., 550 F.3d 605, 612 -613 (7th Cir. 2008) ("As we have often observed, summary judgment is the "put up or shut up" moment in the life of a case.") (citing Johnson v. Cambridge Industries, Inc., 325 F.3d 892, 901 (7th Cir. 2003)).

28

Defendant had good reason to think that because the issue had been resolved on summary judgment, it need not put in evidence at trial to refute Roberts's testimony.  To reopen the question at this time would be unfairly prejudicial to defendant.

It is true that Prey told plaintiff he thought that the quoted price for the fixtures seemed fair.  However, this was before defendant had seen the quality of the fixtures that were produced.  Defendant cannot be bound by an opinion expressed before any of its employees had viewed the finished products.

Plaintiff is seeking reimbursement for the costs of the Martha Stewart logos and casters, both of which it failed to include in the quotation it gave defendant.  It is not entitled to any money for those items; their omission from the quotation was plaintiff's oversight.  Under the parties' agreement, errors and omissions were to be the sole expense of the party that incurred the error.

Plaintiff is entitled to the total amount of the quotations it can prove are free from markups for profit and overhead, or $2,158,662.  It has been paid $1,972,065.50.

For its part, defendant had two categories of pre-agreed manufacturing costs.  One was the quoted cost of bed sets in the amount of $210,375; another was payment for handling and distribution, which the parties agreed would be included as 5.3% of the total cost of the fixtures, with "cost" for this purpose calculated as the landed duty paid by plaintiff.  Plaintiff does not challenge either of these categories as costs, although it reserved an option to object

29

to using the quoted price for the bed sets in the event that the court was unwilling to treat plaintiff's costs in the same way.  Because I am using quoted costs for both parties, plaintiff's objection is moot.


2. Costs for expedited delivery of fixtures

Plaintiff contends that it is entitled to reimbursement for 50% of the costs of expediting shipping that it contends were necessitated by delays in obtaining special materials required for the project and in meeting Federated's needs.  It asks specifically for reimbursement for  the cost of air freight for (a) the fixtures for the first six stores that were to be installed in May 2007; (b) 16 lead tables and 19 icon towers sent on June 17, 2007; (c) metal and acrylic parts required for the 102 fixtures that defendant produced when it became clear that plaintiff could not meet the delivery schedule for the first six stores; (d) additional hardware for these fixtures necessitated by defendant's failure to request the correct quantities; (e) replacement hardware for allegedly missing pieces; (f) logos that were late in arriving in China because of delays by the logo supplier.  It asks also for the extra cost of expedited delivery from the West Coast required to meet Federated's schedule.

In support of its claim for these costs, plaintiff dwells at length on its alleged inability to obtain specific shipping schedules from defendant.  As the facts show, it was plaintiff that was dragging its feet over the production of shipping schedules.  Despite the many email

30

requests from defendant for a firm schedule, Dembart's response was always that "[plaintiff] was working on it."  On April 11, he said that plaintiff's planning had to be revised because of its misunderstanding about the way in which production was to take place.  Plaintiff had not realized that it could not make the entire quota of one particular fixture before starting another one but had to make different items simultaneously.  This misunderstanding cannot be blamed on defendant.  As I have found, Dembart knew immediately after the auction that Federated was planning store by store installations and that shipping would be by stores.  Dembart is plaintiff's agent; his knowledge is attributed to his principal.

Defendant challenges all of plaintiff's requests for reimbursement of shipping costs, arguing that no expedited shipping would have been necessary had plaintiff performed as it had promised.  Defendant has the better of the argument.  Plaintiff's inability to meet the production schedule to which it committed forced it to expedite its shipments.  Defendant is not required to share the costs resulting from plaintiff's mistakes and failures.

a. Air freight for fixtures for first six stores

From the beginning of the parties' relationship, both were aware of the tight timelines that Federated was imposing on its vendors.  On February 9, well before the auction, Federated stated that it expected that the project would begin shipping about May 21.  As of February 21, plaintiff was estimating that it could ship 33% of the fixtures each month,

31

starting in May.  On April 11, plaintiff promised that it would deliver the fixtures for the first six stores in May and agreed to adjust its schedule to make the delivery.  Dembart continued to confirm that plaintiff understood the schedule and would meet the requirements.  Finally, on April 25, he sent defendant a binding delivery schedule, showing that plaintiff would make the first two shipments by air.

Plaintiff contends that any delays in production were not within its control but were attributable to defendant's failure to inform plaintiff of the exact quantities needed each week to meet the schedule; delays in approval of the prototypes; and delays in obtaining the special fabric and Corian product that Federated required.  Without those problems, plaintiff maintains, it could have met the schedule without expedited shipping.

Plaintiff's claimed lack of knowledge of the production quantities rings hollow.  Dembart never told defendant that it could not provide a schedule without knowing the quantities that Federated would require each week.  In any event, plaintiff knew in early March that Federated was expecting delivery of items for six stores before the end of May.  On April 11, Dembart sent defendant a weekly schedule showing that it would deliver the first six stores in May.  He did not limit the number of fixtures plaintiff would supply and he did not ask for more information about what was to be included in the first shipment.  Eight days later, he had the formal purchase orders from Nicole Jahnke, defendant's project manager.

32

As for the fabric and Corian, these are red herrings because they were not integral to the fixtures but could be (and were) installed after the main bodies of the fixtures had been produced.  The delay in obtaining these two materials would not have slowed down production in China.  No doubt this is why Dembart was willing to set a binding delivery schedule on April 25, when it was still unclear when the Corian and fabric could be delivered in China.

The final approval of the prototypes was not a legitimate cause of any delay in production and delivery schedules.  According to plaintiff, mass production of the fixtures was under way on April 25, more than a week before Federated's review took place.  The changes Federated asked for after the review were minor in nature and not intended to delay production.  Moreover, defendant told plaintiff explicitly that the changes did not apply to fixtures that were in production at the time.  It is telling that plaintiff never complained at the time of being delayed by any changes stemming from the prototype review.

Plaintiff has not asked for reimbursement or cost-sharing of its air freight charges for the prototypes.  It is not entitled to any in light of the condition in which the prototypes arrived in Madison.  Under the parties' agreement, the party responsible for an error or omission is responsible for any expenses associated with the error.  Plaintiff produced prototypes that were defective and it failed to protect them from damage in shipping.  These errors were not attributable to defendant; it would be inequitable to ask defendant to share

33

the costs of shipping defective, inadequately packaged fixtures.

Although plaintiff does not ask for cost-sharing of the air freight for the prototypes, it does ask for the cost-sharing of the air freight for certain fixtures that were allegedly produced for the first six stores. This is an odd request. Plaintiff was forced to ask defendant to manufacture between 102 and 106 fixtures in Madison supposedly because plaintiff was unable to produce the fixtures in time to meet the Federated schedule. When plaintiff broached the idea to defendant to produce the fixtures for the first six stores, plaintiff said it could get the fixtures to defendant in time only if it sent them by air. It suggested that if defendant did the manufacturing, plaintiff would not have to pay $72,000 to air freight 60 fixtures. Now it says it is entitled to air freight for 54 fixtures it sent to defendant, thinking that defendant needed them to complete the installation of the first six stores and it blames Jahnke, for not letting it know that the 54 fixtures were not necessary.

Plaintiff misplaces the blame. Plaintiff was the one who first raised the idea of having defendant manufacture the fixtures necessary to meet the first installation. At no time in the parties' email exchanges on the subject did plaintiff say anything about having to manufacture any fixtures other than the 18 bed frames (actually "Icon headboards") and 24 toppers in China to fill out the order. After the flurry of emails on May 2, each party knew which of them was responsible for every one of the 144 items necessary for the first six stores. Inexplicably, plaintiff later air freighted 54 fixtures to defendant, not including the

34

18 Icon headboards or 24 toppers it had agreed to produce.  It says now that it did so because it was under the impression that these additional fixtures were necessary to make the first installations.  It does not identify the source of this "impression."  When the parties began the May 2 negotiations, they were discussing the need for approximately 155 fixtures. Later in the day,  they realized that 11 of the items were not needed, making the total for production 144.  Of this total, defendant was to produce 102 items; plaintiff was to produce 42. Plaintiff does not say what made it think that another 54 fixtures were necessary or why it would send the 54 fixtures by air after it had used the high cost of air freight as the reason why defendant should manufacture the first shipment of fixtures.  Most curious is why plaintiff never mentioned in the May 2 series of emails that it would be manufacturing 54 fixtures over and above the pieces it told defendant it would provide.

Fortunately, it is not necessary to answer the questions plaintiff's claim raises.  It is plaintiff's task to prove that the extra expense of air freight was necessary for reasons outside its own error or omission; plaintiff has not made that showing.  It is not entitled to treat as a shared cost the extra expense it incurred to send the 54 fixtures that arrived in Madison on May 17.

b. Air freight for lead tables and icon towers sent on June 17, 2007

Although plaintiff says that it had to send these items by air freight to meet

35

Federated's needs, the evidence shows that it would not have had to do so had it included them in the two June shipments, as it had agreed to do. Plaintiff is not entitled to the extra expense of air freight for these items.

c. Air freight for metal and acrylic parts required for the fixtures that defendant was producing

Because defendant was forced to produce 102 fixtures for the first six stores when plaintiff was unable to make them in time for the promised delivery, the extra cost of air freight for sending the parts should not be a cost that defendant has to absorb in whole or in part. Plaintiff would not have incurred this cost had plaintiff carried out its commitment to make timely deliveries of the fixtures.

d. Air freight for additional hardware that defendant forgot to order

This additional cost was necessitated by an error on defendant's part and, for that reason, should be defendant's sole responsibility. However, plaintiff has not identified any proof in the record of the cost of this air freight.

e. Air freight for replacement hardware for allegedly missing pieces

This expense is plaintiff's alone. Defendant's records show that plaintiff omitted

36

hardware and other auxiliary pieces from shipments on a regular basis.  Defendant should

not be required to pay any portion of the extra costs incurred because of plaintiff's omissions.

f. Air freight for logos that were late in arriving in China

The supplier of the logos was late in producing them and sending them to China,

which meant that plaintiff could not attach them to the fixture shipment that was en route

on May 14.  Instead, it air mailed the logos to defendant for attachment to the fixtures upon

delivery.  This delay is not attributable to either party.  I would order that the air freight be

treated as a shared cost, but I cannot determine the cost for this mailing.

g. Extra costs of expedited delivery from the West Coast

These extra costs are not shared costs because it was plaintiff's responsibility to make

the deliveries on time.  Its failure to meet the production and delivery schedules is not

defendant's fault.  It held itself out as willing and able to meet the schedule.

3. Extra costs incurred for Corian and glue

Although the parties discussed the extra costs incurred in providing plaintiff with the

Corian and glue it needed, neither briefed the issue after trial.  I consider the issue waived.

C. Defendant's Alleged Breach of the Agreement

Plaintiff contends that defendant breached the agreement by including profit and indirect costs in (1) manufacturing fixtures for the project; (2) repairing damaged and defective fixtures that plaintiff delivered; (3) buying mattresses and box springs for the project; and (4) warehousing, handling and distributing fixtures.  As explained above, defendant's price quotations for its amended bid included the quotation it obtained for mattresses and box springs and its estimates of labor costs for warehousing, handling and distributing the fixtures.  Plaintiff knew about these costs and approved them before defendant submitted the amended bid.

This leaves for consideration the costs of repairing the damaged and defective fixtures that plaintiff delivered and the costs for manufacturing the fixtures for the first six stores. I will set aside the first category of costs for discussion in connection with damages and address only the legitimacy of defendant's charges for profits, overhead and indirect costs in connection with its production of 102 items for the first six stores.  The issue can be disposed of quickly, in light of plaintiff's invitation to defendant to add profit to its costs for coming to plaintiff's assistance when it found itself unable to produce the items it had promised to deliver in May.  Having secured defendant's agreement to put everything aside

38

and scramble to build 102 fixtures, plaintiff is in no position to complain that the charge for the work included the profit it promised defendant, as well as overhead.  Even if plaintiff had not made the promise, it cannot claim this work as a "shared" expense when it would not have been necessary but for plaintiff's inability to carry out its commitment to produce fixtures in a timely manner.

### D. Defendant's Non-Bid Work Done for Federated

The parties dispute defendant's entitlement to keep for itself the payments it received from Federated for work that was not part of the original bid.  Although defendant would not have had the opportunity to do this work were it not for the winning bid it submitted and the subsequent relationship between it and Federated, the work was not part of the original bid; the parties were not sharing the risk for the work, as they did on the performance of the original bid; and defendant had sole responsibility for the work done. Under these circumstances, I see no reason to fold the extra work into the original agreement.  Defendant is entitled to retain the payments it received.  At the same time, it cannot charge plaintiff for any of the costs incurred in performing the extra work.

### E. Damages

Under Wisconsin law and the Uniform Commercial Code, a buyer is entitled to

damages if the goods it buys are not what they were warranted to be.  Wis. Stat. § 402.714. (UCC 2-714).  The measure of damages is the difference between the value of the goods as delivered and their value had they been as warranted.  The statute provides that the damages are to be determined "in any manner that is reasonable."  Defendant contends that the most reasonable way in which to determine the difference in value is to use the costs it incurred to make the fixtures merchantable.  Plaintiff does not object to measuring the damages in that way, but it contends that defendant cannot prove either what it spent for repairs or that the fixtures needed the repairs that defendant says they did.  Plaintiff points out that defendant took no photographs of the allegedly defective pieces or kept any other kind of record of the defects.

Defendant countered plaintiff's first point at trial with testimony by its employees of the frantic nature of the repair operation, under the tight deadlines of the Martha Stewart Project, complicated by plaintiff's tardy deliveries of the fixtures.  In these circumstances, taking photographs of each fixture and documenting the deficiencies was neither feasible nor economically reasonable.  Defendant needed all of its employees on the repair line, not behind cameras.

It makes little sense to think that defendant was spending time making repairs to fixtures that did not need them.  Defendant had no reason to do so and many reasons not to.  Its employees were angry and demoralized by having to work overtime and weekends

40

during the summer months; defendant had no guarantee that it would be reimbursed for the expenses it was incurring; and it could have spent the same time doing work for other customers or lining up future orders.

Plaintiff argues that defendant has not provided adequate documentation for the costs it incurred in making repairs, but this argument is a non-starter.  Defendant produced charts of its expenditures and stood ready to produce all the underlying documentation for each category of costs.  Plaintiff never asked for this documentation in discovery, as it could have had it wanted to assure itself of the validity of the claimed expenses.

Attacking the amounts sought by defendant on another ground, plaintiff asserts  that defendant did not separate the costs it incurred in repair work from the costs it incurred in fulfilling the post-bid projects it did for Federated.   It objects specifically to defendant's claiming to have done the crating of the Corian tops, alleging that it was the one that did the crating.

In fact, defendant has deleted the costs of the primary job it did for Federated, which was the splitting of the armoires.  The labor costs for that work are not part of the claim it is making.  The crating of the Corian remains disputed.  Because the record is not clear on that point, I will order the parties to split the payments received from Federated for the crating work.  As for the other matters, the warehouse space and the visual handling of small items, I will reduce defendant's claimed costs by $3000 to insure that plaintiff is not charged

41

for costs attributable to the post-bid work that defendant did for Federated.

Defendant is asking for $22,100 as reimbursement by plaintiff of back charges it must pay Federated for freight charges defendant would not have incurred were it not for plaintiff's breach. Its request excludes any charges objected to by plaintiff and is less than defendant was charged for late deliveries of "toppers," for which defendant's freight charges are $10,497, charges for delivery of back-ordered items (not including Corian) of $9494 and charges of $5875 for switching out defective fixtures. I will grant this request.

With the minor adjustments I have made, I am satisfied that defendant is entitled to the amount of damages it has claimed for the work it did to make the fixtures fit Federated's reasonable expectations.


F. Summary

The total amount of money paid by Federated to defendant was $4,992,494. (I am rounding all numbers to the nearest dollar.). After deducting $115,274 for the payments Federated made to defendant for post-bid work ($11,150 for visual handling, $6055 for extra freight charges incurred by defendant, $6007 for storage and $69,962 for armoire splitting), as well as Federated's back charge of $22,100, the payment subject to sharing is $4,877,220.

Plaintiff's shared costs are $2,164,125, which includes the Wanhengtong price estimate of $1,642,662, the freight estimate of $516,000 and plaintiff's half of the Corian

42

crating or $5,463.

Defendant's shared costs are $413,949, of which $210,375 is for mattress sets, $198,111 is for handling and distribution of the fixtures and $5,463 is for plaintiff's half of the crating cost.

Deducting the parties' shared costs from the Federated payment of $4,877,220 subject to splitting leaves $2,299,146. Each party is entitled to one-half of $2,299,146 or $1,149,573. Plaintiff's share of profits plus its costs of $2,164,125 is $3,313,698. Defendant has paid plaintiff $1,972,066 to date. Defendant should be credited for the cost of the materials it provided, $114,952, for a total credit of $2,087,018. Deducting this amount from plaintiff's share of profits leaves $1,226,680. I will subtract from this sum $1,160,008 in damages to which defendant is entitled for the extra costs it incurred to repair and deliver fixtures that were defective or delayed in shipment, minus the $3000 I am deducting to insure that defendant is not paid damages for costs it incurred in doing post-bid work for Federated. The sum defendant owes plaintiff is $63,672. However, the parties have stipulated that plaintiff owes defendant $73,222 from a previous project for Sheraton known as Link. When all is said and done, plaintiff owes defendant $9550.

ORDER

43

IT IS ORDERED that plaintiff Superl Sequoia Limited's motion for reconsideration of the court's July 23, 2008 summary judgment order is DENIED; plaintiff is directed to pay defendant The C.W. Carlson Company, Inc., a/k/a The Carlson Company, Inc. $9,550.00 as damages for plaintiff's breach of the parties' agreement.  The clerk of court is directed to enter judgment for defendant in the amount of $9,550.00 and close the case.

Entered this 1st day of May, 2009.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

44